IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

ANTONIO DESHAWN DANIELS

Criminal Action No.

1:20-CR-306-TWT-CMS-1

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

The United States of America, by Ryan K. Buchanan, United States Attorney, and Nicholas Hartigan, Assistant United States Attorney for the Northern District of Georgia, hereby opposes Defendant's Motion to Suppress (Doc. 153). Daniels seeks to suppress evidence seized from five locations pursuant to five separate federal search warrants. The Court should deny his motion without a hearing because: (1) he does not have standing to challenge the search of two locations; (2) evidence was seized pursuant to valid search warrants supported by probable cause; and (3) the good-faith exception precludes suppression. His arguments can be resolved based on the warrants and affidavits.

## BACKGROUND

In March 2020, agents began a federal wiretap investigation focused on Daniels and his conspirators. (*Id*. at 15-16). Agents developed evidence that Daniels routinely stayed, stored drugs and assets, or met conspirators at five separate residences in the Atlanta area. (*Id*. at 16). On July 20, 2020, United States Magistrate Judge Alan J. Baverman signed five search warrants authorizing the search of those properties. Specifically:

1. **<u>Target Location #1</u>**: property located at 555 Whitehall Street, SW, Unit H, Atlanta, Georgia 30303 (hereinafter "555 Whitehall")

   · **Warrant Obtained:** July 20, 2020 (1:20-MC-1246, **attached as Exhibit A**)[1]

   · **Warrant Executed:** July 27, 2020

2. **<u>Target Location #2</u>**: property located at 3039 Clarendale Drive NW, Atlanta, Georgia 30327 (hereinafter "3039 Clarendale")

   · **Warrant Obtained:** July 20, 2020 (1:20-MC-1247, **attached as Exhibit B**)

   · **Warrant Executed:** July 27, 2020

3. **<u>Target Location #3</u>**: property located at Creekside Corner Apartments, 5301 W Fairington Parkway, Unit 3106, Lithonia, Georgia 30038 (hereinafter "Creekside Corner")

   · **Warrant Obtained:** July 20, 2020 (1:20-MC-1248, **attached as Exhibit C**)

   · **Warrant Executed:** July 27, 2020

4. **<u>Target Location #4</u>**: property located at Atler at Brookhaven apartments, 3833 Peachtree Road NE, Unit 712, Atlanta, Georgia 30319 ("Atler Unit 712")

   · **Warrant Obtained:** July 20, 2020 (1:20-MC-1249, **attached as Exhibit D**)

   · **Warrant Executed:** July 28, 2020

---

[1] The five search warrants were all based on the same affidavit ("Aff."), which referred to each premises as a "Target Location." Each warrant incorporated an Attachment A that identified the property in further detail, including photographs of the property. For example, the search warrant for 555 Whitehall Street incorporated Attachment A-1, which described the property in detail and included four photographs of the apartment. Additionally, each warrant incorporated the same Attachment B that described the items to be seized. Here, the Government attaches the warrant, attachments, and the supporting affidavit for Exhibit A (1:20-MC-1246, search warrant for 555 Whitehall Street, SW, Unit H, Atlanta, Georgia 30303). For the remaining search warrants, the Government attaches only the warrant and attachments.

5. **<u>Target Location #5</u>**: property located at Atler at Brookhaven apartments, 3833 Peachtree Road NE, Unit 715, Atlanta, Georgia 30319 ("Atler Unit 715")
   · **Warrant Obtained:** July 20, 2020 (1:20-MC-1250, **attached as Exhibit E**)
   · **Warrant Executed:** July 28, 2020

The warrants authorized agents to seize "evidence and instrumentalities" of violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, as well as 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957. (Aff. at Attachment B). The warrants then went on to describe 13 categories of what such "evidence and instrumentalities" might be, including drugs, money, guns, financial records, and electronic devices. (*Id.*) The warrants also authorized agents to seize electronic devices and the contents thereof from August 1, 2018 to July 20, 2020, which constituted evidence of these same offenses. (*Id.*) Similarly, the warrant described six categories of what such evidence might be, including photographs, communications, and contacts. (*Id.*)

## I.   Daniels's Motion to Suppress

In his motion, Daniels challenges the legality of all five search warrants, ostensibly raising a litany of issues. In a purely conclusory fashion, Daniels claims the warrants are (i) overbroad; (ii) lacking in sufficient particularity allowing for the general rummaging through the premises; and (iii) lacking in temporal restrictions. (Doc. 153 at 3). He claims the affidavit failed to establish probable cause the sought-after items would be found in the searched locations because the information was based on: (i) unreliable sources, (ii) speculation, (iii) stale information, (iv) lack of nexus to the place searched, and (v) lack of specific information as to the items to be seized. (Doc. 153 at 5).

Some of the challenges, such as the claim that the warrants were based on stale information, are detailed enough to be decided as a matter of law based on the underlying applications, affidavits, and orders. Others, such as the blanket, unsubstantiated claim that the warrant allowed for general rummaging through the premises, are too vague to warrant consideration. All should be denied because the search warrants contained sufficient probable cause to show that evidence of his participation in a drug and money laundering conspiracy would be found in the residences, and that the information was not stale. Even if the judge who authorized the search warrants did not have a substantial basis to find probable cause, suppression of the evidence is not an appropriate remedy because agents had a good faith basis to believe the orders were valid.

## II. Factual Background – Evidence in the Search Warrant Affidavit

### A. Background of the Investigation and Affiant's Qualifications

The affidavit began with a description of DEA Task Force Officer (TFO) David Noe's qualifications and the sources of information in the affidavit. (Aff. at 2-10). He had worked in law enforcement for more than 35 years and had participated in more than 20 wiretap investigations, 300 arrests, and 150 searches. (*Id*. at 2-4.) He believed drug trafficking and money laundering were continuing activities over months and even years. (*Id*. at 6). Drug traffickers use multiple phones to coordinate drug purchases and sales, and they maintain lists of names, phone numbers, and phones where they have ready access to them. (*Id*. at 6-8). TFO Noe interpreted the coded conversations based on his training and experience and the context of the conversations as they related to the investigation. (*Id*. at 9).

Next, the affidavit provided background of the investigation before agents began intercepting Daniels's phones. (*Id*. at 10-15). The investigation began in October 2019 when agents seized 13 kilograms of cocaine, $690,000, and a drug and money ledger accounting for more than 2,000 kilograms of cocaine into the Atlanta area and the return of more than $67.7 million to Mexico between January 24, 2017 and September 29, 2019. (*Id*. at 10). Agents interpreted the ledger based on information from reliable confidential sources with first-hand knowledge of individuals in the drug trafficking organization. (*Id*. at 11-12). Based on this information, the ledger reflected that Daniels received more than 1,000 kilograms of cocaine and returned more than $31 million in drug proceeds. (*Id*. at 13). To substantiate this belief, the affidavit described specific entries in the ledger between August and November 2018 which showed that Daniels paid more than $3.4 million for 116 kilograms of cocaine. (*Id*. at 13-14).

The affidavit identified the federal wiretap orders which authorized wire and electronic interceptions over six phones used by Daniels between March and July 2020. (*Id*. at 15-16). Agents identified the five locations through surveillance in conjunction with geo-location data and intercepted communications, which established a long and complex pattern of activity by Daniels that TFO Noe believed made it even more likely that all five locations contained evidence. (*Id*. at 16-17). Next, the affidavit provided information showing each location contained evidence of Daniels's drug trafficking and money laundering. (*Id*. at 17-47). TFO Noe explained (1) how Daniels used the location in furtherance of his drug and money laundering conspiracy, (2) how agents identified the location,

5

and (3) intercepted communications and surveillance showing Daniels's use of the location. (*Id.*) The last section of the affidavit described the process agents followed to search and seize electronic devices and storage media. (*Id.* at 47-51). TFO Noe believed evidence related to the offenses was likely to be on the devices because Daniels had been conducting these activities over a lengthy period and used multiple phones to communicate with conspirators. (*Id.* at 47-48).

### B. Target Location #1 – 555 Whitehall

Agents used intercepted communications over three phones, surveillance, and geo-location data from three phones to identify 555 Whitehall as Daniels's apartment where he routinely spent the night. (*Id.* at 17). In intercepted calls, Daniels identified the apartment complex as a location where he prepared drugs for distribution, distributed drugs, collected proceeds, and met conspirators. (*Id.* at 17, 20-25, 32-33). Agents identified Daniels's unit by following directions that Daniels relayed to a drug customer on May 28, 2020. (*Id.* at 17-19). Based on records from Georgia Power and a reliable confidential informant, the power bill was listed in the name of Daniels's associate and drug customer. (*Id.* at 19).

Intercepted communications, surveillance, and geo-location data showed that Daniels distributed drugs from 555 Whitehall on May 13, May 22, and July 15, 2020. (*Id.*) On May 13, Daniels instructed two customers (Head and UM1801) to come to 555 Whitehall to receive drugs. (*Id.* at 20-22). When UM1801 reported that he arrived to meet Daniels, agents saw a white pickup truck entering the parking lot at 555 Whitehall. (*Id.* at 22). Minutes later, Daniels told HEAD that he was preparing drugs to give UM1801 while geo-location data showed Daniels's

phone in the vicinity of 555 Whitehall. (*Id*. at 23). On May 22, Daniels had UM27 give Niteria Patterson drugs from 555 Whitehall so she could deliver them to a customer. (*Id*. at 23-24). Patterson reported to Daniels when she spotted agents conducting surveillance as she drove away from 555 Whitehall. (*Id*. at 23-25).

Third, on July 15, Patterson received drugs from Daniels at 555 Whitehall and took them to 3039 Clarendale. (*Id*. at 31-33). On July 13, Patterson asked to be the first customer when Daniels received a shipment of drugs and confirmed that she had $45,000 for the purchase. (*Id*. at 31-32). On July 15, Daniels said he was processing drugs to give her. (*Id*. at 32). That afternoon, at approximately 2:47 p.m., agents observed Patterson leave 3039 Clarendale. (*Id*. at 33). At approximately 3:03 p.m., Patterson reported that she was outside. (*Id*.) Agents observed her pull into the parking lot of 555 Whitehall at approximately 3:04 p.m. (*Id*.) Two minutes later, agents observed her depart 555 Whitehall and return to 3039 Clarendale. (*Id*.) Based on the intercepted calls and surveillance, TFO Noe believed Patterson traveled to 555 Whitehall to buy drugs from Daniels and then returned to 3039 Clarendale with the drugs. (*Id*.)

### C. Target Location #2 – 3039 Clarendale

Agents used intercepted communications over two phones, surveillance, and geo-location data from two phones to identify 3039 Clarendale as a location used by Daniels and Patterson to store drugs and drug proceeds. (*Id*. at 25-26). TFO Noe identified 3039 Clarendale as Patterson's home where she stored drugs, proceeds, and records related to Daniels's and her drug distribution. (*Id*.)

Intercepted communications showed that Daniels used Patterson to store and deliver drugs to customers. (*Id*. at 26-28). On May 21, 2020, Daniels talked with Patterson about distributing marijuana, including the number of units in each package, how she should package them, the price she should charge, and how they would split the profits. (*Id*. at 26-27). That same day, Daniels instructed her to deliver one package of marijuana to a customer, keep a record of the sale, and to cut open one of the packages to send him a photograph. (*Id*. at 27-28).

Intercepted communications, surveillance, and geo-location data showed that Patterson used 3039 Clarendale to store drugs and drug proceeds for Daniels. (*Id*. at 29-33). On May 20, 2020, agents intercepted a wire communication between Daniels, using TT#2, and Patterson during which Daniels asked if she had a key for the "side door," which TFO Noe interpreted to mean a key to a room Daniels maintained at 3039 Clarendale. (*Id*. at 29).  Daniels said he would be there in a couple minutes, and then geo-location data for TT#2 showed the device travel to the vicinity of 3039 Clarendale. (*Id*.) Agents observed an Acura MDX registered to Patterson parked in the driveway of 3039 Clarendale, and they observed her and Daniels meeting at 3039 Clarendale on multiple occasions in May and June. (*Id*. at 29-30). Patterson used a phone Daniels provided to communicate with him about drug transactions, including the drugs she received at 555 Whitehall on July 15 before immediately returning to 3039 Clarendale. (*Id*. at 31-33).

### D. Target Location #3 – Creekside Corner

Agents used intercepted communications over one phone, surveillance, and geo-location from one phone to identify Creekside Corner as an apartment where

8

Daniels prepared drugs, distributed drugs, collected drug proceeds, and met conspirators. (*Id*. at 33). Agents identified Unit 3106 as the unit Daniels used in the apartment complex based on surveillance and video recordings following a drug transaction with UM168 on May 25, 2020. (*Id*. at 33-34, 36). Unit 3106 was rented in the name of "Huni El," and agents intercepted text messages between Daniels and Patterson during which she sent that name and a phone number the day before the rent was paid for the unit. (*Id*. at 34). An employee at the complex told agents that a light-skinned black male with a lot of freckles rented the unit but hardly ever stayed there. (*Id*.) Based on the employee's description, TFO Noe believed Daniels was the person who rented the Creekside Corner unit. (*Id*.)

Intercepted communications, surveillance, and geo-location data showed that Daniels sold drugs to UM168 at Creekside Corner on May 25, 2020. (*Id*. at 34-37). On the morning of May 25, Daniels offered to sell UM168 one unit of drugs at Creekside Corner. (*Id*. at 35-36). When UM168 reported that he arrived, agents observed a man believed to be UM168 pull into the Creekside Corner parking lot in a beige Cadillac Escalade. (*Id*. at 36). Based on the intercepted communications and surveillance, TFO Noe believed Daniels and UM168 conducted a drug transaction involving one unit of drugs inside the Cadillac, and Daniels returned to Unit 3106 with drug proceeds. (*Id*. at 36-37).

### E.  Target Locations #4 and #5 – Atler Unit 712 and Atler Unit 715

Agents used intercepted communications over four phones, surveillance, and geo-location data from four phones to identify Atler Unit 712 and Atler Unit 715 as apartments where Daniels prepared drugs, distributed drugs, collected drug

proceeds, and met conspirators. (*Id*. at 37). The units were the primary location Daniels stayed overnight when he was not at 555 Whitehall. (*Id*.) Atler Unit 712 was rented in Daniels's name, and the Georgia Power bill for the apartment was in his name. (*Id*. at 38). Atler Unit 715 was rented in the name of Lorene Reeves, a drug worker and courier for Daniels. (*Id*. at 38-39). On June 11, 2020, a courtesy officer for the complex said Daniels paid the rent for Atler Unit 715 in June, and Daniels discussed a payment of $2,000 to Reeves in July so that Reeves could pay the rent for Atler Unit 715. (*Id*. at 39). Additionally, Daniels communicated with drug workers such as Bishop about returning a key for Atler Unit 715. (*Id*. at 42).

Intercepted communications, surveillance, and geo-location data showed that Daniels used Atler Unit 712 and Atler Unit 715 to prepare drugs for distribution, distribute drugs, collect drug proceeds, and meet with conspirators. (*Id*. at 43-46). Daniels, using TT#1, arranged to sell drugs to multiple customers on April 11 and geo-location data showed TT#1 in the vicinity of the apartment complex when the customers arrived. (*Id*. at 44-45).

### F.  Evidence of Daniels's Use of Multiple Locations at the Same Time

After describing Daniels's drug sales between April 11 and July 15, 2020, TFO Noe explained why he expected to find evidence at all five locations Daniels used to facilitate his conspiracy. (*Id*. at 46).  Drug traffickers rotate between multiple locations to prevent law enforcement and robbery threats from identifying where they routinely kept drugs and proceeds, and Daniels used the locations to store drugs in addition to the dates when agents intercepted him discussing sales at those locations. (*Id*.) TFO Noe described items of evidentiary

value that he had seized during search warrants at the homes of drug traffickers, including drugs, drug ledgers, money, firearms, photographs, and phones used to communicate with conspirators. (Id. at 52). Firearms belonging to Daniels had been seized on April 17 during a search warrant, and Daniels had multiple arrests for felon in possession. (*Id*.) As a result, he believed the items described in Attachment B would be found in all five locations. (*Id*.)

### G. Execution of Search Warrants at 555 Whitehall and 3039 Clarendale

On July 27, 2020, agents executed the search warrant at 555 Whitehall and seized approximately 8 kilograms of marijuana, 10 kilograms of cocaine, 23.6 kilograms of heroin/fentanyl/procaine mixture, 3.7 kilograms of heroin, over $2.1 million in cash, and 41 guns. A large quantity of the drugs and money were locked in a blue job box at the back of the studio apartment. That same day, agents searched Patterson's two-bedroom home at 3039 Clarendale. Patterson's child and brother were there when agents arrived, and the home contained a large amount of her personal information. In one bedroom, agents found a safe that contained approximately 88 grams of heroin, cash, and documents with Patterson's name, including tax filings. In the other bedroom, agents found a blue job box that contained approximately 10.48 kg of heroin, and 134.1 kg of heroin/fentanyl/procaine mixture. The blue job box was locked, but agents did not find a locked room that Daniels maintained at 3039 Clarendale.

## III.   STANDARD OF REVIEW

Search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Daniels bears the burden of establishing the warrants in this

case were defective or executed improperly. *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986). "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). A fair probability exists "when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." *United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012). Neither certainty nor a preponderance of the evidence is required. *Gates*, 462 U.S. at 246.

To determine whether a search warrant is supported by probable cause, the Court's task is not to conduct a *de novo* determination of probable cause, but only to determine whether the evidence viewed as a whole provided a "substantial basis" for the probable cause finding when the warrant was issued. *Massachusetts v. Upton*, 466 U.S. 727, 728, 732-33 (1984). The Supreme Court warned of the error of "not consider[ing an agent's] affidavit in its entirety" and "judging bits and pieces of information in isolation." *Id*. at 732.

The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). "'[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Id*.

12

The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977). It is only necessary that the facts presented would "warrant a man of reasonable caution" to believe evidence of crime will be found. *Texas v. Brown*, 460 U.S. 730, 742 (1983). The issuing judge may rely upon the opinions and conclusions of an experienced agent-affiant about where evidence of a crime is likely to be found. *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992). When the affidavit's probable cause presents a close call, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734.

## IV.    ARGUMENT

### A. Daniels does not have standing to suppress evidence seized from 3039 Clarendale or Creekside Corner.

The question of whether the disputed search and seizure infringed an interest of the defendant is a threshold inquiry which the Court must determine. *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984). The Fourth Amendment's protections are personal, and only individuals who possess a subjective and an objective expectation of privacy have standing to challenge a governmental search. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978). Thus, "[t]he individual challenging the search bears the burdens of proof and persuasion" to establish a legitimate expectation of privacy in the area searched. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). A defendant cannot establish Fourth Amendment standing merely by having an ownership or privacy interest in the

13

evidence seized. *Rawlings v. Kentucky*, 448 U.S. 98, 105-06 (1980). Instead, a defendant must show a legitimate expectation of privacy in the place searched, not the things seized. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

Daniels bears the burden of showing that he had a "constitutionally protected reasonable expectation of privacy" in 3039 Clarendale and Creekside Corner. *New York v. Class*, 475 U.S. 106, 112 (1986); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). He cannot simply rely on conclusory statements to establish standing. *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (holding that defendants' references to hotel room searched as "theirs" was insufficient to demonstrate standing); *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (holding that conclusory statements were insufficient to establish standing). Nor may he rely on the government's theory of the case. *United States v. Thompson*, 171 F. App'x 823, 828 (11th Cir. 2006) (concluding that motion to suppress relying on government contention that room was rented by defendant was insufficient to establish standing); *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (holding that district court may not grant a defendant standing to pursue a suppression motion "relying solely on the government's theory of the case," because to do so would amount to "an evisceration of the defendant's burden of proof as established by the Supreme Court.").

The factual allegations must be sufficiently definite, specific, detailed, and nonconjectural to enable the Court to determine a substantial claim is presented. *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983). To demonstrate a legitimate expectation of privacy, he must show (1) an actual subjective

14

expectation of privacy, and (2) his subjective expectation of privacy is one society is prepared to accept as objectively reasonable. *Harris*, 526 F.3d at 1338. This is a "fact-specific" inquiry. *Cooper*, 133 F.3d at 1398. A legitimate expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Carter*, 525 U.S. at 88.

Here, to establish standing, Daniels explicitly relies on the government's theory ("allegations contained in the Affidavit itself"). (Doc. 153 at 3 n.1). The only facts he alleged were: (1) the affidavit identified 3039 Clarendale "as a residence 'used' by Movant at which he (Movant) 'maintains' a locked room;" and (2) the affidavit stated that "Movant allegedly rents [Creekside Corner]." (*Id*.) Despite an opportunity to perfect his motion, he presented no evidence that he had a reasonable expectation of privacy in either location. (Docs. 275, 283).

As to 3039 Clarendale, the affidavit stated that Patterson lived there, not Daniels, and the residence was "used by Daniels and Patterson to store drugs and drug proceeds." (Aff. at 25). The affidavit then discussed intercepted communications showing that Patterson stored Daniels' drugs and proceeds in her home and noted that Daniels met with Patterson at that location on multiple occasions in May and June 2020. (*Id*. at 26-29). TFO Noe interpreted a May 20 call between Daniels and Patterson as a discussion about a room Daniels maintained at 3039 Clarendale. (*Id*. at 29). But agents did not find a locked room at 3039 Clarendale when they searched the home on July 27. Instead, they found a locked blue job box that contained over 144 kilograms of heroin.

15

Simply put, Daniels fails to allege sufficient facts to establish a legitimate expectation of privacy in 3039 Clarendale. He neither volunteered information nor identified any evidence to prove that he owned, rented, leased, managed, or had control over the premises. Nothing in the affidavit suggests he spent even one night at 3039 Clarendale. Property law does not control whether an individual's expectation of privacy is objectively reasonable, but neither is it irrelevant. *See Rakas*, 439 U.S. at 143 n.12 ("[o]ne of the main rights attaching to property is the right to exclude others…and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."). Indeed, even a person's legitimate presence on a searched premises, without more, is insufficient to establish standing to challenge the search. *United States v. Antone*, 753 F.2d 1301, 1306 (5th Cir. 1985). But here, Daniels was not present when agents executed the search warrant. The affidavit establishes only that he periodically visited Patterson's home, and that Patterson stored drugs in her home that belonged to Daniels. These facts are insufficient to meet Daniels's burden to show a legitimate expectation of privacy in the place searched, rather than the things seized. *Carter*, 525 U.S. at 88.

As to Creekside Corner, the affidavit included (1) an employee's description of the man who rented the apartment but hardly ever stayed there; (2) TFO Noe's belief that the employee described Daniels; and (3) evidence Daniels used the apartment on May 25 to sell drugs. (Aff. at 34-37). But Daniels has not confirmed he was the person the employee described. Nor has he volunteered information or identified any evidence to prove that he owned, rented, leased, managed, or

16

had control over the premises. Here, as in *Thompson*, Daniels's reliance on the
government contention that the apartment was rented by him is not sufficient to
establish standing. *Thompson*, 171 F. App'x at 828.

Even if Daniels could establish a link to 3039 Clarendale or Creekside Corner,
his expectation of privacy in a stash house is not one society is prepared to accept
as reasonable. In *Carter*, the Supreme Court held that visitors packaging cocaine
at another person's house for less than three hours did not have an objectively
reasonable expectation of privacy in the place searched sufficient to confer
standing. *Carter*, 525 U.S. at 86, 91. Factors important to the Court in reaching this
conclusion included that the defendants were on the premises for a "purely
commercial" transaction and were there for a "relatively short period of time."
*Id*. In stash house cases, courts have given particular weight to the "commercial"
factor in *Carter* to conclude that a defendant lacked an objectively reasonable
expectation of privacy sufficient to confer standing. *See e.g.*, *United States v. Gray*,
491 F.3d 138, 153-54 (4th Cir. 2007) (holding defendant did not have standing to
challenge search of apartment he was using to traffic drugs); *United States v.
Perez*, 280 F.3d 318, 338 (3d Cir. 2002) (defendants demonstrated no reasonable
expectation of privacy because no evidence they were at the apartment for any
purpose other than to engage in drug-related activities). So too here.

### B. The affidavit provided a substantial basis for concluding there was a fair probability of finding evidence in all five locations.

The facts in the affidavit are more than sufficient to establish probable cause.
The affidavit detailed months of investigation beginning with the seizure of

17

drugs, money, and a ledger identifying the scope of Daniels's drug sales dating back to 2018. That information was then corroborated by months of federal wiretaps, surveillance, and seizures. Each intercepted communication and drug transaction bolstered facts in other conversations and confirmed Daniels's involvement in a drug and money laundering conspiracy using those locations. From these facts, it was reasonable to believe evidence of that conspiracy was in locations Daniels used to prepare drugs, sell drugs, and meet conspirators.

Without elaboration, Daniels claims the affidavit was based on unreliable sources and speculation. (Doc. 153 at 5). Not so. To be sure, the affidavit includes information from sources to identify: (1) Daniels as the person listed as "Sean" or "Pecas" in the ledger, and (2) the person listed on the power bill for 555 Whitehall as Daniels's drug customer. (Aff. at 10-13, 19). But the affidavit described each confidential source's veracity, reliability, and basis of knowledge, as well as their motivation for providing information. *Gates*, 462 U.S. at 230. And the crux of the affidavit came from a federal wiretap investigation, including intercepted communications that corroborated information from sources about his involvement. *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992). Given the appropriately detailed affidavit chronicling the ongoing wiretap investigation, it was proper for the reviewing judge to rely on TFO Noe's reasonable interpretation of coded or obtuse language in conspiratorial communications to determine the existence of probable cause. *See United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (issuing judge may properly rely upon the opinions of an experienced agent); *United States v. Alfano*, 838 F.2d 158,

162-63 (6th Cir. 1988) ("While the defendants hypothesize that all of these calls could have simply involved innocuous family matters, the probable cause requirement does not require that every contrary hypothesis be excluded.").

### 1. The affidavit established a nexus between the objects to be seized and the five premises.

The affidavit established (1) a connection between Daniels and the locations to be searched; and (2) a link between the locations and the criminal activity. *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2019). Simply put, there was a fair probability Daniels would hide contraband and instrumentalities of the conspiracy in his homes and stash houses, particularly when he sold drugs at each location. *Id.* ("few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.").

First, the affidavit established Daniels's connection to each location based on intercepted communications, surveillance, and his rent payments. Second, the affidavit established a link between the location and drug conspiracy through intercepted communications, surveillance, and geo-location data showing Daniels met conspirators, stored drugs, and sold drugs at each location. Daniels and Patterson possessed drugs and cash, contraband that is of the type that would normally expect to be hidden at a residence. *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence of possession of contraband of type normally expected to be hidden in residence will support search); *United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (nexus can be established circumstantially when contraband can be hidden in a residence). Indeed, she

returned directly to 3039 Clarendale after receiving drugs from Daniels at 555 Whitehall. *United States v. Hicks*, 575 F.3d 130, 136 (1st. Cir. 2009) (nexus created based on officer following defendant back to home after a controlled purchase).

Moreover, the affidavit established that Daniels or his conspirators lived in many of the properties. TFO Noe, an experienced narcotics investigator, advised that drug traffickers commonly use their residences to store drugs, U.S. currency, firearms, records related to drug sales, and phones with information identifying conspirators. *United States v. Bradley*, 644 F.3d 1213, 1263-64 (11th Cir. 2011) ("a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause"). Courts routinely rely on the common sense finding that drug dealers are likely to keep evidence of their drug business at home to support the nexus for search warrants when supported by the opinion of an experienced agent-affiant. *See e.g.*, *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) ("When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's").

## 2. The information contained in the affidavit was not stale.

To satisfy the probable cause standard, the government "must reveal facts that make it likely that the items being sought are in that place when the warrant issues." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994). The information supporting of the government's application for a search warrant must be timely when the search warrant is issued. *United States v. Bascaro*, 742 F.2d 1335, 1345

(11th Cir. 1984).  When an affidavit describes activity indicating protracted or continuous conduct, "it is more likely that the passage of time will not dissipate probable cause." *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985).

Judge Baverman signed the warrant on July 20, 2020, which was: (1) **only five days** after intercepted communications and surveillance showed Patterson bought drugs from Daniels at 555 Whitehall and immediately returned to 3039 Clarendale; (2) less than two months after Daniels distributed drugs from Creekside Corner; (3) just over three months after Daniels distributed drugs from the Atler at Brookhaven; and (4) only seven days after Daniels discussed paying the rent for Atler Unit 715. (Aff. at 31-33, 34-37, 38, 44-46).

Here, the affidavit discussed Daniels's involvement in a drug and money laundering conspiracy over months of wiretaps with records from years before. Accordingly, Daniels's criminal activity may be considered protracted and continuous rather than isolated. *See United States v. Williams*, 177 F. App'x 914, 921 (11th Cir. 2006) ("By its nature, drug dealing is an ongoing activity, not an isolated occurrence"). Indeed, the affidavit explicitly said Daniels was involved in a long and complex pattern of activity. (Aff. at 46). In other cases of continuous criminal activity, the Eleventh Circuit has found information in search warrants of even lengthier delays not to be stale based on the particular facts and circumstances of those cases. *See e.g.*, *United States v. Bervaldi*, 226 F.3d 1256, 1264-67 (11th Cir. 2000) (6 months in drug case); *Domme*, 753 F.2d at 953-55 (9 months in drug case). Thus, information in the warrant application was not stale.

**C.  The warrants were not overbroad or lacking in particularity.**

Daniels states, in a purely conclusory fashion, that the warrants were overbroad, lacking in particularity, and lacked temporal restrictions. He makes no particularized argument regarding these issues and identifies no evidence seized under the overbroad portion of the warrant. The Court need not engage in an extensive review based on this inadequate and factually inaccurate claim. First, the Eleventh Circuit has expressly disallowed such unsubstantiated claims. "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented.... A court need not act upon general or conclusory assertions." *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (quoting *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985)). There is nothing definite, specific, or detailed in Daniels's one-sentence claim.

Second, the warrant explicitly limited the scope of things to be seized. The Fourth Amendment requires that a warrant particularly describe both (1) the place to be searched, and (2) the persons or things to be seized. U.S. Const. amend IV. A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized. *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985). The test is whether the search was a general exploration or specifically directed to the means and instrumentalities by which the crime charged had been committed. *Harris v. United States*, 331 U.S. 145, 153-54 (1947); *United States v. Betancourt*, 734 F.2d 750, 754-55 (11th Cir. 1984) (stating that a warrant's description need not contain elaborate specificity). "The

22

remedy for overbreath in a warrant is severance." *United States v. Brown*, 374 F. App'x 927, 936-37 (11th Cir. 2010). Items seized but not particularly described in the warrant are excluded from evidence, but the rest of the warrant remains valid. *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000).

Here, the opening phrase of Attachment B to the warrants operates as a limitation, authorizing the seizure of "evidence and instrumentalities" of particular federal crimes. (Aff. at Attachment B). Attachment B then enumerates 13 illustrative categories of items in subsections (a) through (m), and many of those contain additional limiting provisions. (*Id.*) For example, subsection (g) limits the authority for seizing information to those of "co-conspirators, sources of supply, customers, and/or locations used to store drugs, drug proceeds, or records of the drug trafficking and money laundering conspiracy." (*Id.*)

"By explicitly limiting the scope of what could be seized to evidence of the crimes under investigation, the warrants were sufficiently particular to enable the searches to reasonably ascertain and identify the documents and information authorized to be seized." *United States v. Soviravong*, No. 1:19-cr-146-AT-CMS, 2019 U.S. Dist. LEXIS 227361, 2019 WL 7906186, at *8 (N.D. Ga. Dec. 2, 2019). The Eleventh Circuit has affirmed seizures under "warrants authorizing the seizure of … evidence" relating to the specific crimes charged, observing that the "general description sufficed because the exact identity of the evidence to be seized could not have been known at the time the warrant issued and because the warrant limited the search to evidence of [the relevant crimes]." *Santarelli*, 778 F.2d at 614; *see also Signature Pharmacy, Inc. v. Wright*, 438 F. App'x 741, 745-46

(11th Cir. 2011). Simply put, the warrant limits items to be seized to those connected with the crime under investigation, satisfying the practical realities of the Fourth Amendment. *United States v. Smith*, 918 F.2d 1501, 1507-08 (11th Cir. 1990) (approving similar language for documents pertaining to drug trafficking). Thus, the warrants were not overbroad or lacking in particularity.

Daniels does not elaborate on his allegation that the warrant lacks temporal restrictions. To be sure, the warrant explicitly limited the contents of electronic devices to data from August 1, 2018 to July 20, 2020 which constituted evidence of the same federal criminal violations. (Aff. at Attachment B). Daniels cites no cases asserting that a temporal limitation is required for search warrants authorizing the seizure of physical evidence, such as drugs, money counters, firearms, and photographs. Even so, the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity. Thus, the absence of a time frame did not render the otherwise particularized warrants unconstitutionally general. *United States v. Hernandez*, 2010 WL 26544, 2010 U.S. Dist. LEXIS 719, at *37 (S.D.N.Y. Jan. 6, 2010).

**D. Agents acted on the good faith belief that the warrants were valid.**

The Supreme Court has recognized a good faith exception to the exclusionary rule that focuses upon whether officers who seized evidence acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 922 (1984). Suppression of evidence is not an appropriate remedy if the officers conducting the search acted in "objectively reasonable reliance" on a court order or warrant. *Id.* Ordinarily,

"a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.*

The *Leon* good faith exception applies in all but four limited sets of circumstances: (1) where the magistrate in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003).

Here, Daniels does not argue that the agents who executed the searches had no good faith basis to believe that the warrants were valid. There is no allegation that the issuing magistrate was misled by information in the affidavit or wholly abandoned his judicial role. The 53-page affidavit was not a bare-bones statements with only conclusory allegations. *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). Agents reasonably held a good faith belief that the search warrants were valid given the thoroughness and detail of the affidavits presented in support. And the warrants adequately described the place and items to be searched so that the officers could ascertain and identify the place intended and reasonably ascertain and identify the things to be seized. Thus, the *Leon* good faith exception applies, and there is no basis for suppression.

**Conclusion**

For the foregoing reasons, the Court should DENY Defendant's motions to suppress without an evidentiary hearing.

Respectfully submitted,

R<small>YAN</small> K. B<small>UCHANAN</small>
*United States Attorney*


/s/N<small>ICHOLAS</small> H<small>ARTIGAN</small>
*Assistant United States Attorney*
Georgia Bar No. 408147
Nicholas.Hartigan@usdoj.gov

26

**Certificate of Service**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Bruce S. Harvey

*May 20, 2022*

/s/ NICHOLAS HARTIGAN

NICHOLAS HARTIGAN

*Assistant United States Attorney*