IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTONIO DESHAWN DANIELS,<br><br>Defendant. | CRIMINAL ACTION NO.<br><br>1:20-cr-306-TWT-CMS |

**FINAL REPORT & RECOMMENDATION**

Defendant Antonio Deshawn Daniels has filed a motion to suppress evidence seized pursuant to five search warrants. [Doc. 153]. For the reasons discussed below, I will recommend that this motion be denied.

**I.   BACKGROUND**

On July 17, 2020, DEA Task Force Officer David Noe submitted an application and affidavit for warrants to search five residences associated with a large drug conspiracy. [Doc. 285-1 at 9–71 ("Noe Aff.")]. TFO Noe's affidavit was the same for all five applications.

**A. Facts Contained in the Affidavit Supporting the Five Warrants**

In his affidavit, TFO Noe provided facts concerning a large drug conspiracy that the DEA was investigating. According to TFO Noe, the investigation began in October 2019 when, as part of an investigation into a drug trafficking organization

operating in the Atlanta, Georgia area, Texas, and Mexico, agents seized thirteen kilograms of cocaine, $690,000, and a drug/money ledger accounting for thousands of kilograms of cocaine coming into the Atlanta area between January 2017 and September 2019. [Noe Aff. ¶ 14]. The ledger showed that Daniels was one of the largest customers in the Atlanta area, having received more than 1,000 kilograms of cocaine during that time. [*Id.* ¶ 17].

The affidavit identified multiple federal wiretap orders that authorized wire and electronic interceptions over several phones used by Daniels between March and July 2020. [Noe Aff. ¶ 23]. Those intercepted communications, in conjunction with geo-location data and physical surveillance, showed a long and complex pattern of drug-related activity by Daniels and led agents to the five residences that the agents sought to search. [*Id.* ¶ 24]. As more specifically set forth below, the affidavit provided information showing Daniels's ties to each of the five target residences and provided facts tending to show that evidence of Daniels's drug trafficking and money laundering would be found at those locations. [*Id.* ¶¶ 25–74].

### *Facts Regarding Location #1 – Whitehall Street*

Location #1 was a residence located at 555 Whitehall Street SW, Unit H, in Atlanta, Georgia. According to TFO Noe, agents used intercepted communications over three phones, surveillance, and geo-location data from the phones to identify

the Whitehall Street location as Daniels's apartment where he routinely spent the night and where he prepared drugs for distribution, distributed drugs, collected proceeds, and met conspirators.  [Noe Aff. ¶¶ 25, 28–37].  In May 2020, agents identified the specific unit by following directions that Daniels relayed to a drug customer.  [*Id.* ¶ 26].  Based on records from Georgia Power and a reliable confidential informant, agents determined that the power bill for that unit was listed in the name of an associate and drug customer of Daniels.  [*Id.*].

According to TFO Noe, intercepted communications, surveillance, and geo-location data showed that Daniels distributed drugs from the Whitehall Street location on at least three dates in 2020.  [Noe Aff. ¶¶ 28–37, 50–52].  According to TFO Noe, on May 13, 2020, Daniels instructed two customers (identified as "Head" and "UM1801") to come to 555 Whitehall Street to receive drugs.  [*Id.* ¶¶ 29–32]. When UM1801 reported that he had arrived, agents were surveilling the Whitehall Street location and saw a white pickup truck entering the parking lot.  [*Id.* ¶ 33].  The wiretaps reveal that minutes later, Daniels told Head that he (Daniels) was preparing drugs to give to UM1801, and at the same time, geo-location data showed Daniels's phone in the vicinity of the Whitehall Street location.  [*Id.* ¶ 34].

TFO Noe avers that eight days later, on May 22, 2020, intercepted wire communications showed that Daniels directed a person identified as "UM27" to give

Daniels's codefendant, Niteria Patterson, drugs from 555 Whitehall Street so Patterson could deliver them to a customer. [Noe Aff. ¶¶ 35, 36]. Later that day, the wiretaps show that Patterson reported to Daniels that she had spotted agents conducting surveillance as she drove away from the Whitehall Street location. [*Id.* ¶ 37].

Two months later, on July 15, 2020, agents intercepted a wire communication between Daniels and Patterson in which Daniels said that he was processing drugs to give to Patterson, and Patterson agreed to pay the price they had discussed. [Noe Aff. ¶¶ 50, 51]. Shortly thereafter, agents observed Patterson leave her house (Location #2 discussed below) and arrive at the Whitehall Street location. [*Id.* ¶ 52]. She stayed for two minutes and then returned to her home. [*Id.*].

*Facts Regarding Location #2 – Clarendale Drive*

Location #2 was at 3039 Clarendale Drive NW, in Atlanta, Georgia. TFO Noe averred that agents used intercepted communications over two phones, surveillance, and geo-location data from those phones to identify the Clarendale Drive location as a place that Daniels and Patterson used to store drugs and drug proceeds. [Noe Aff. ¶ 38]. TFO Noe identified the Clarendale Drive location as Patterson's home. [*Id.*].

Intercepted communications showed that Patterson assisted Daniels by storing and delivering drugs to customers. [Noe Aff. ¶¶ 39–45]. On May 21, 2020, Daniels talked with Patterson about distributing marijuana, specifying the number of units in each package, how Patterson should package them, the price she should charge, and how they would split the profits. [*Id.* ¶¶ 40–43]. That same day, Daniels instructed Patterson to deliver one package of marijuana to a customer, to keep a record of the sale, and to cut open one of the packages to send him a photograph. [*Id.* ¶¶ 41–43].

As mentioned above, according to TFO Noe, intercepted communications, surveillance, and geo-location data showed that Patterson used the Clarendale Drive residence to store drugs and drug proceeds for Daniels. [Noe Aff. ¶¶ 44–52]. For example, he averred that on May 20, 2020, agents intercepted a wire communication between Daniels and Patterson during which Daniels asked if Patterson had a key for the "side door," which TFO Noe interpreted to mean a key to a room Daniels maintained at the Clarendale Drive location. [*Id.* ¶ 45]. Shortly after Daniels told her that he would be there in a couple minutes, geo-location data reflected that Daniels's phone was in the vicinity of the Clarendale Drive location. [*Id.*]. Agents observed an Acura MDX registered to Patterson parked in the driveway of the Clarendale Drive residence, and they observed Patterson and Daniels meeting there on multiple occasions in May and June of 2020. [*Id.* ¶ 46]. Moreover, the agents

5

learned that Patterson used a phone that Daniels had provided to communicate with him about drug transactions, including the drugs she received at the Whitehall Street location on July 15, 2020 before immediately returning back home to the Clarendale Drive location. [*Id.* ¶ 47].

### *Facts Regarding Location #3 – Fairington Parkway*

Location #3 was an apartment in the Creekside Corner Apartment complex located at 5301 W. Fairington Parkway, Unit 3106, in Lithonia, Georgia, that was rented in the name of "Huni El." [Noe Aff. ¶ 54]. TFO Noe averred that agents used intercepted communications over one phone, surveillance, and geo-location from that phone to identify the Fairington Parkway apartment as a location where Daniels prepared drugs, distributed drugs, collected drug proceeds, and met conspirators. [*Id.* ¶ 53]. Agents intercepted text messages between Daniels and Patterson during which Patterson sent the name "Huni El" the day before the rent was paid for the unit. [*Id.* ¶ 54]. An employee at the complex told agents that a light-skinned black male with a lot of freckles rented the unit but hardly ever stayed there. Based on the employee's description, TFO Noe believed Daniels was the person who paid the rent for the Fairington Parkway apartment. [*Id.*].

According to TFO Noe's affidavit, agents identified the Fairington Parkway apartment as a place Daniels used for his drug-trafficking activities based on

surveillance and video recordings following a May 25, 2020 drug transaction with an individual identified as "UM168." [Noe Aff. ¶ 54]. Intercepted communications showed that Daniels had purchased a telephone for UM168 to use to talk with Daniels about drug business. [*Id.* ¶ 55]. Intercepted wire communications showed that on May 25, 2020, Daniels and UM168 discussed a drug deal. Later that day, UM168 advised that he had arrived. [*Id.* ¶¶ 56–58]. At that time, agents were conducting surveillance at the Fairington Parkway apartment, and they observed a man believed to be UM168 pull into the Creekside Corner parking lot in a beige Cadillac Escalade. [*Id.* ¶ 59]. Agents observed Daniels walk from the breezeway of the building where the apartment is located and meet with the man inside the Cadillac. [*Id.*]. Fifteen minutes later, Daniels got out of the Cadillac carrying a large shoe bag and walked back toward the breezeway of the building where the apartment is located. Agents later obtained a video showing Daniels entering the apartment carrying the shoe bag he had received from UM168. [*Id.*].

***Facts Regarding Locations #4 and #5 – Atler at Brookhaven, Units 712 and 715***

Location #4 and Location #5 are two units (712 and 715) at the Atler at Brookhaven Apartments, located at 3833 Peachtree Road NE, in Atlanta, Georgia. According to TFO Noe, these units were the primary location Daniels stayed overnight when he was not at the Whitehall Street location. [Noe Aff. ¶ 60]. Atler

7

Unit 712 was rented in Daniels's name, and the Georgia Power bill for the apartment was in his name. [*Id.* ¶ 61]. Atler Unit 715 was rented in the name of Lorene Reeves, a drug worker and courier for Daniels, and the investigation showed that Daniels paid the rent for that unit, as well as for Unit 712. [*Id.*].

On April 10, 2020, agents intercepted a wire communication between Daniels and a person identified as "UM2507" during which they discussed a proposed drug deal. [Noe Aff. ¶ 70]. The next day, the wiretaps showed that Daniels told UM2507 to go to "Buckhead." [*Id.* ¶ 71]. Later that day, UM2507 advised that he was "at the gate." [*Id.* ¶ 72]. At the time of that communication, geo-location data showed that one of Daniels's phones was in the vicinity of the Atler at Brookhaven apartment complex. [*Id.*]. Later that same day, wiretaps showed that Daniels conducted a drug deal with a man identified as "UM151," and the man stated that he had arrived at the apartment complex gate. [*Id.* ¶¶ 73–74].

### B. The Warrants

On July 20, 2020, United States Magistrate Judge Alan Baverman signed the five warrants that TFO Noe had presented, as follows:

> 1:20-mc-1246: Target Location #1: 555 Whitehall Street, SW, Unit H, Atlanta, Georgia, 30303 ("the Whitehall Street Warrant") [Doc. 285-1];

    1:20-mc-1247:  Target Location #2: 3039 Clarendale Drive, NW, Atlanta, Georgia, 30327 ("the Clarendale Drive Warrant") [Doc. 285-2];

    1:20-mc-1248:  Target Location #3: 5301 W. Fairington Parkway, Unit 3106, Lithonia, Georgia, 30038 ("the Fairington Parkway Warrant") [Doc. 285-3];

    1:20-mc-1249:  Target Location #4: 3833 Peachtree Road, NE, Unit 712, Atlanta, Georgia, 30319 ("the Atler 712 Warrant") [Doc. 285-4]; and

    1:20-mc-1250:  Target Location #5: 3833 Peachtree Road, NE, Unit 715, Atlanta, Georgia, 30319 ("the Atler 715 Warrant") [Doc. 285-5].

Collectively, these five warrants are referred to herein as "the Warrants."

The Warrants authorized agents to seize "evidence and instrumentalities" of violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, as well as 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957. [Doc. 285-1 at 6, ¶ 1]. The Warrants then went on to describe thirteen categories of what such "evidence and instrumentalities" might be, including drugs, money, guns, financial records, and electronic devices. [*Id*. at 6–8, ¶ 1(a)–(m)]. The Warrants also authorized agents to seize electronic devices and the contents thereof that constituted evidence of these same offenses and contained a date restriction of August 1, 2018 to July 20, 2020. [*Id.* at 6, ¶ 1(f)]. Similarly, the Warrants described six categories of what such electronic evidence might be, including photographs, communications, and contacts. [*Id.* at 6–7, ¶ 1(f)(i)–(vi)].

9

### C. The Motion to Suppress

Daniels filed a six-page "Preliminary Motion to Suppress." [Doc. 153]. In his motion, Daniels asserts that the Warrants lack probable cause. In making this argument, he briefly discusses a few facts contained in TFO Noe's affidavit and makes sarcastic comments such as "Really? That's it? If that's all it takes to get a search warrant – almost *two months* prior – the Fourth Amendment is a dead letter!" [Doc. 153 at 3–5 (emphasis in original)]. Daniels provides no legal authority or caselaw to support his probable cause arguments.

I gave Daniels two opportunities to perfect his motion, but he never did so. [Doc. 275 (minutes showing that Daniels was given until April 6, 2022 to perfect the motion); Doc. 283 (order extending the deadline to perfect the motion until May 13, 2022)]. After Daniels failed to perfect the motion, the Government filed a response brief. [Doc. 285]. Daniels did not file a reply brief. Because Daniels made at least a cursory effort to challenge probable cause, I will analyze his argument.[1] But the first step is the issue of standing.

---

[1] Daniels also states in a purely conclusory fashion—without addressing any particular facts and with no legal argument or legal citation—that the Warrants are overbroad, lack sufficient particularity, and lack temporal restrictions. [Doc. 153 at 3]. Because Daniels did not even attempt to provide facts, law, or argument with respect to these contentions, I have not addressed them.

## II. DISCUSSION

### A. Standing

The question of whether the disputed search and seizure infringed an interest of the defendant is a threshold inquiry that the Court must determine. *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984). The Fourth Amendment's protections are personal, and only individuals who possess a subjective and an objective expectation of privacy have standing to challenge a governmental search. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 143 (1978). Thus, "[t]he individual challenging the search bears the burdens of proof and persuasion" to establish a legitimate expectation of privacy in the area searched. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998). "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

In its response brief, the Government challenges Daniels's standing with respect to two of the five warrants: the Clarendale Drive Warrant and the Fairington Parkway Warrant. [Doc. 285 at 13–17]. In his original motion, Daniels had stated that he has standing to challenge the Clarendale Drive Warrant because TFO Noe averred that this location was a residence that Daniels allegedly "used" and at which

he maintained a locked room. [Doc. 153 at 3 n.2]. As for the Fairington Parkway Warrant, Daniels states that he has standing to challenge this warrant because TFO Noe averred that Daniels allegedly paid the rent for the apartment. [*Id.*]. Daniels did not file a reply or respond in any way to the Government's assertion in its response brief that he lacks standing to challenge these two warrants.

Upon review of the Noe Affidavit and the facts to which Daniels points in his motion, I conclude that Daniels has not carried his burden to show that he had a reasonable expectation of privacy in either location. According to the affidavit, Niteria Patterson lived at the Clarendale location, not Daniels, and the residence was "used by DANIELS and PATTERSON to store drugs and drug proceeds." [Noe Aff. ¶ 38]. The affidavit then discussed intercepted communications showing that Patterson stored Daniels's drugs and proceeds in her home and noted that Daniels met with Patterson at that location on multiple occasions in May and June 2020. [*Id.* at ¶¶ 40–47]. Nothing about these facts shows that Daniels had a legitimate expectation of privacy in the location. Daniels has not provided evidence to show that he owned, rented, leased, managed, had control over, or ever slept at the premises, and he was not present when agents executed the search warrant. According to the Government's brief, agents did not find a locked room at that location when they searched the home on July 27. Instead, they found a locked blue

job box that contained more than 144 kilograms of heroin. [Doc. 285 at 15]. At most, the affidavit establishes only that Daniels periodically visited Patterson's home as part of his drug-dealing activities, and that Patterson stored his drugs in her home. These facts are insufficient to meet Daniels's burden to show a legitimate expectation of privacy in the place searched, rather than the things seized. *See Minnesota v. Carter*, 525 U.S. 83, 86, 90 (1998) (finding that a location used "for the sole purpose of packaging the cocaine" was "simply a place to do business" and that the defendant had no reasonable expectation of privacy in it).

As to the Fairington Parkway Warrant, the affidavit included facts showing that an employee of the apartment complex thought that Daniels might have been the person who paid rent for the apartment. [Noe Aff. ¶ 54]. The facts in the affidavit show that Daniels used the apartment to sell drugs, not to sleep. In response to the Government's argument that Daniels lacks standing to challenge the Fairington Parkway Warrant, Daniels has not confirmed that he was the person who actually paid the rent there. Nor has he volunteered information or identified any evidence to prove that he owned, rented, leased, managed, or had control over the premises. Daniels's reliance on the Government's contention that he was the person who rented the apartment is not sufficient to establish standing. *See United States v. Thompson*, 171 F. App'x 823, 828 (11th Cir. 2006) (concluding that motion to

suppress relying on government contention that room was rented by the defendant was insufficient to establish standing).

Moreover, even if Daniels could establish a link to either location giving rise to a subjective expectation of privacy, any such expectation of privacy in a location used only to deal drugs is not an expectation that society is prepared to accept as reasonable. *See Carter*, 525 U.S. at 86, 91; *United States v. Gray*, 491 F.3d 138, 153–54 (4th Cir. 2007) (holding that a defendant did not have standing to challenge a search of an apartment he was using to traffic drugs); *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002) (holding that defendants demonstrated no reasonable expectation of privacy in an apartment because there was no evidence that they were at the apartment for any purpose other than to engage in drug-related activities).

For these reasons, I conclude that Daniels has failed to establish standing to challenge the legality of the Clarendale Drive Warrant or the Fairington Parkway Warrant, and his motion to suppress should be denied with respect to these two warrants on this basis.

### B. **Probable Cause**

I now turn to Daniels's challenge to probable cause for the three remaining warrants. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). Issuing judges are to employ a practical, commonsense approach to the probable cause analysis and should avoid hyper-technical review of the legitimacy of search warrants:

> In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high

level of deference traditionally given to magistrates in their probable cause determinations.

*United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (internal citations and quote marks omitted). Reviewing judges should not conduct a de novo determination of probable cause, but rather focus only on whether there is substantial evidence in the record supporting the judge's decision to issue the warrant. *See United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)).

Daniels makes the following argument to challenge the probable cause basis for the Whitehall Street Warrant: "the last phone conversation alleged in the Affidavit relating to Location #1 was May 22, 2020, almost ***two months*** prior to seeking the warrant for this location." [Doc. 153 at 4 (emphasis in original)]. In making this argument, he ignores the fact that TFO Noe recites compelling evidence that on July 15, 2020—a few days before the Whitehall Street Warrant was signed—Niteria Patterson received drugs from Daniels at the Whitehall Street location. [Noe Aff. ¶¶ 50–52]. This argument is factually unsupported and without merit.

As for the warrants for the two Atler at Brookhaven apartments, Daniels makes the following argument, which I have quoted in full:

> Target Location #4 and #5: Location #4 is Movant's "primary location" – it is rented in his name, and the power bill is in his name. And, holy cow, agents intercepted phone conversations about "discussing the

> parking spaces" assigned to Location #5. Likewise, the Noe Affidavit relates an April 17, 2020, stop of Reeves "just South of Macon". During that stop, agents allegedly seized procaine – not Schedule I or II drugs. Likewise, a search at 650 Fairburn Dr. was derailed. (¶63, pp. 39-40). What you may ask, has this to do with probable cause for Locations #4 and #5? Easy answer – nothing. Finally, the fact that Movant may have met *unnamed* coconspirators "by the pool" at the alter [sic] is unconvincing. Like any alleged communications in April 2020 (¶'s 70-74 pp. 44-46). No information that any of the sought-after items would be found in either location.

[Doc. 153 at 4–5]. Thus, Daniels does not dispute his connection to the two apartments or TFO Noe's statement that Daniels slept at these apartments when he was not at the Whitehall Street location. As the Eleventh Circuit has noted, "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (affirming the district court's denial of a motion to suppress and noting that "[t]he justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained."). TFO Noe's affidavit not only provided facts sufficient to establish a connection between Daniels and the two Atler apartments, but also demonstrated a link between those apartments and the criminal activity. These facts, taken together with the ample evidence in other portions of the affidavit showing Daniels's heavy involvement in the drug-

17

trafficking conspiracy, demonstrate that there was probable cause to believe that evidence or contraband would probably be found at the two Atler at Brookhaven apartments. *See Kapordelis*, 569 F.3d at 1310; *Martin*, 297 F.3d at 1314.

## III. CONCLUSION

Daniels lacks standing to challenge the legality of the Clarendale Drive Warrant and the Fairington Parkway Warrant. And contrary to Daniels's bare-bones claims, TFO Noe's affidavit contains ample facts to support a conclusion that evidence of the crimes under investigation would be found at the Whitehall Street location and at the two Atler at Brookhaven apartments. It is evident that law enforcement conducted a detailed, thorough, and lengthy investigation beginning with the seizure of drugs, money, and a ledger identifying the scope of Daniels's drug sales dating back to 2018. That information was then corroborated by months of federal wiretaps, surveillance, and seizures. Each intercepted communication and drug transaction bolstered facts in other conversations and confirmed Daniels's involvement in a drug and money laundering conspiracy using those locations. From these facts, it was reasonable to believe evidence of that conspiracy would be found in the various locations Daniels used for his drug-dealing activity.

For the reasons stated, I **RECOMMEND** that Daniels's motion to suppress [Doc. 153] be **DENIED**. There are no other pending matters before me in this case.

Accordingly, the defendant's case is hereby **CERTIFIED** ready for trial. Pretrial motions for other co-defendants remain pending.

This 17th day of February, 2023.

_____
CATHERINE M. SALINAS
United States Magistrate Judge